[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This matter is before the Court on Norman Jacques' application for Post-Conviction Relief pursuant to R.I.G.L. §10-9.1-1 (1985).
The initial petition was filed on March 21, 1988 after an appeal of his conviction was denied by the Rhode Island Supreme Court in State v. Jacques, 536 A.2d 535 (1988). An amended petition for Post-Conviction Relief was filed by State appointed counsel for Jacques on May 31, 1988.
The grounds upon which this application is filed are as follows:
1. That the Statutory Scheme under which he received the indictment R.I.G.L. § 11-37-1 violates the due process clause of the Fourteenth Amendment of the United States Constitution. Further, that trial justice incorrectly instructed the jury regarding the elements necessary to convict him of the crime of sexual assault.
2. Prosecutorial abuse in that it is alleged that the prosecutor knowingly withheld evidence favorable to the defense during both the Grand Jury and Petit Jury proceeding.
3. That the petitioner did not receive effective assistance of counsel at trial.
4. That since the Petit Jury trial, which resulted in the Petitioner being convicted of first degree sexual assault, the Petitioner has acquired newly discovered evidence which the Petitioner believes could result in a favorable verdict if a new trial was granted.
5. That the sentence the Petitioner received violates both the Rhode Island and United States Constitutions.
Wherefore the Petitioner requests that the Court:
1. Conduct a full evidentiary hearing with respect to the allegations of the said petition.
2. Grant Petitioner's request for Post-Conviction Relief.
3. Reduce the sentence imposed by the Trial Judge.
BACKGROUND State v. Jacques, 536 A.2d 535 (R.I. 1988), contains the substantive facts of the case. Jacques was originally indicted for violating R.I. Gen. Laws §§ 11-37-2 and 11-37-3 (1985). On March 20, 1986, Jacques was convicted for violating § 11-37-2 for engaging in sexual penetration of a female through the use of force or coercion. Jacques filed a motion for a new trial on April 18, 1986, which was denied. On June 20, 1986, Jacques received a prison sentence of twelve years: four years were to serve and eight years were suspended. Jacques served a total of 18 months in prison. Jacques' appeal was denied and his conviction was affirmed in State v. Jacques.
This petition for Post-Conviction Relief was commenced in March of 1988 by Jacques and shortly thereafter he was found to be indigent which resulted in the appointment of a State attorney by the Court.
On May 18, 1988 Attorney Susan Iannitelli was appointed by the court and filed an amended Petition for Post-Conviction Relief. During this period of time Associate Justice Francis Kiely, who presided over the petit jury trial which resulted in the conviction of Jacques, retired from the Superior Court and the pending Petition was assigned to Justice Grande. While this case was before Judge Grande, the designated State's attorney, Susan Iannitelli, moved to withdraw her appearance for the reason that Jacques had requested her to do so. On August 18, 1988 Judge Grande granted her request to withdraw.
On August 17, 1988, Judge Grande ordered the sealing of a certain envelope containing papers and other materials and that it be placed in the fifth floor vault, the Court's Registry Department. A motion filed by Jacques' attorney to inspect the contents of this envelope was denied by this Court with the suggestion that counsel appeal to the Supreme Court for the purpose of gaining access to the contents of this envelope. No further action was ever taken by Petitioner's counsel to acquire this information. Judge Grande recused herself from hearing the petition and this resulted in this case being assigned to Justice Thomas J. Caldarone, Jr.
Several months passed before the question for a newly appointed State Counsel was addressed. On March 3, 1989 Attorney William Filippo was appointed by the Court and this appointment was refused. On March 23, 1989, Attorney Robert D. Watt was appointed and his motion to withdraw was filed on June 19, 1989 and granted. Finally, on November 20, 1989 Attorney Martin Malinou was appointed and remained as counsel until the matter was called for an evidentiary hearing in December 1993. During the period that ensued between March, 1989 and December, 1993 numerous appearances were made by counsel before the Court accompanied with the submission of numerous written memoranda in support and denial of the State's Motion for Summary Judgment.
This Court assigned the evidentiary hearing of the case for the first week of December, 1993. A ten day notice was given to both Petitioner's counsel and to the State. On the day the hearing was to commence, Jacques requested an indefinite continuance for the purpose of acquiring new counsel. Jacques indicated that he had spoken to a well-known constitutional lawyer and wanted him to represent him at the hearing. The Court continued the hearing one week in order to accommodate Jacques. On the next assigned date, Jacques informed the Court that his chosen attorney was not available on this newly assigned date and requested another continuance. The Court informed Jacques that the Court had set aside the necessary time to engage in the hearing and refused Jacques' request. Jacques was informed by the Court that he could proceed with his present counsel, Martin Malinou, or select to represent himself pro se. Jacques objected to the court's ruling and informed the Court that he would proceed pro se. The Court then informed Jacques that because of the extensive and apparent effective assistance provided by Attorney Malinou up to that point in the proceedings, it would serve the interest of all parties, including the Court, that Attorney Malinou be appointed stand-by counsel, but the Court made it very clear to Jacques that Jacques did not have to utilize him consistent with his constitutional right not to do so. Jacques was informed that Attorney Malinou would be available and would be able to accompany Jacques in the courtroom in any way Jacques would decide. Again, Jacques expressed his objection to the Court's ruling that his request for continuance was denied. The hearing commenced, and during the hearing, Attorney Malinou was utilized at Jacques' counsel table, and at the request of Jacques, Malinou engaged in some of the direct and cross-examination of witnesses. He also assisted Jacques with the preparation of written memorandum. Jacques principally did conduct the presentation of the evidence in support of the allegations contained in the Petition for Post-Conviction Relief.
STANDARD OF REVIEW
R.I. Gen. Laws §§ 10-9.1-1 to 10-9.1-9 (1985) governs the statutory remedy of Post-Conviction Relief. The remedy is available to persons convicted of crimes who claim, interalia, that the conviction violated their constitutional rights, or that newly discovered facts require vacation of the conviction in the interest of justice. R.I. Gen. Laws § 10-9.1-1 (1985).Palmigiano v. State, 120 R.I. 402, 404, 387 A.2d 1382, 1385.
This Statute reads as follows:
 10-9.1-1. Remedy — To Whom available — Conditions. — (a) Any person who has been convicted of, or sentenced for, a crime, a violation of law, or a violation of probationary or deferred sentence status and who claims:
 (1) that the conviction or the sentence was in violation of the constitution of the United States or the constitution or laws of this state;
 (2) that the court was without jurisdiction to impose sentence;
 (3) that the sentence exceeds the maximum authorized by law, or is otherwise not in accordance with the sentence authorized by law;
 (4) that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice;
 (5) that his sentence has expired, his probation, parole, or conditional release unlawfully revoked, or he is otherwise unlawfully held in custody or other restraint; or
 (6) that the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under any common law, statutory or other writ, motion, petition, proceeding, or remedy; may institute, without paying a filing fee, a proceeding under this chapter to secure relief.
 (b) This remedy is not a substitute for nor does it affect any remedy incident to the proceedings in the trial court, or of direct review of the sentence or conviction. Except as otherwise provided in this chapter, it comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence. It shall be used exclusively in place of them.
In a proceeding under this Chapter the petitioner generallybears the burden of proving his allegation by a preponderance ofthe evidence. Palmigiano v. Mullen, 119 R.I. 363, 377 A.2d 242
(1977).
A trial justice is permitted under § 10-9.1-6(b) to dismiss an application whenever, based upon the record, the application, and the answer, he or she finds that no genuine issue of material fact exists. The standard employed in making this determination is the same as motions pursuant to Super. R. Civ. P. 12(b)(6).Palmigiano, 120 R.I. at 404-405, 387 A.2d at 1384.
R.I.G.L. § 10-9.1-6(c) permits the trial justice to grant a motion for summary disposition of the application when based upon the pleadings, discovery, and affidavits introduced, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Id. at 405, 387 A.2d at 1384. The Rules of Civil Procedure permit the Court to treat 12(b)(6) motions as motions for summary judgment when matters outside the pleadings are presented to the Court. Super. R. Civ. P. 12(b)(c).See Menzies v. Sigma Pi Alumni Ass'n of Rhode Island,110 R.I. 488, 294 A.2d 193 (1972); DiBello v. St. Jean, 106 R.I. 704,262 A.2d 824 (1970).
The State filed motions for summary judgment under the provisions of R.I.G.L. §§ 10-9.1-6(b) and Super. R. Civ. P. 12(b)(6). In said motions the State alleged the absence of any genuine issue of material fact and requested the dismissal of the Jacques' petition for Post-Conviction Relief.
This issue was joined by the Petitioner in the filing of an objection, and at the suggestion of the Court, memoranda were submitted by the parties in support of their respective positions with respect to the State's motion to dismiss. After considerable argument and review of the pleadings, affidavits, answers to interrogatories, documentation, this Court ordered an evidentiary hearing which extended over a period of six trial days. The Petitioner subpoenaed numerous witnesses in an effort to support the allegations contained in his petition. After the hearing was completed, counsel submitted proposed finding of facts and conclusions of law.
Each ground upon which the application for Post-Conviction raises a distinct issue which requires that it be considered separately. Such finding of facts as may be necessary to establish the resolve of the many issues will be supplied in this decision.
I. R.I. GEN. LAWS 11-37-1 (1985)
Jacques claims that the statutory scheme under which he received the indictment R.I. Gen. Laws §§ 11-37-1, 11-37-2(c), and 11-37-3 (1985), violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Jacques asserts that the definition of the term "sexual penetration delegates unlimited discretion to the Attorney General and the courts to define the crime . . ." (Jacques' Application for Post-Conviction Relief at 3).
The Supreme Court has repeatedly stated that when interpreting statutes, the court will first give the statutory language its plain and ordinary meaning. State v. Markarian,551 A.2d 1178, 1180 (R.I. 1988) (citing McGee v. Stone,522 A.2d 211, 216 (R.I. 1987); State v. Gonsalves, 476 A.2d 108, 110 (R.I. 1984)). When there is no ambiguity in the statutory language, the plain meaning of such language is authoritative, and no further statutory construction is necessary. Id. at 1181 (citing State v. O'Rourke, 463 A.2d 1328, 1130 (R.I. 1983);Rhode Island Chamber of Commerce v. Hackett, 122 R.I. 686, 690,411 A.2d 300 (1980)).
The term sexual penetration is defined as follows:
 [S]exual intercourse, cunnilingus, fellatio, and anal intercourse, or any other intrusion, however slight, by any object, by any part of a person's body or by any object into the genital or anal openings of another person's body, but emission of semen is not required.
R.I. Gen. Laws § 11-37-1(b) (1985).
This Court finds that the definition of "sexual penetration" is unambiguous and specific for the act of penetration. The Attorney General and the Court do not have unlimited discretion as to what constitutes the crime of sexual assault. When the Court instructs a jury or when the state seeks an indictment, neither may exercise any discretion because R.I.G.L. § 11-37-1
specifically defines sexual penetration. See State v.Jacques, 536 A.2d 535, 538 (R.I. 1988). Jacques' allegations of the unconstitutionality of the statutory scheme that he was indicted and convicted under are meritless. See also State v.Jacques.
II. GRAND JURY PROCEEDINGS
The Petitioner contends that the actions of the prosecutor in presenting the State's case to the Grand Jury created an atmosphere that poisoned the Grand Jury. Specifically, Petitioner contends that the Grand Jury was unduly influenced when Kuzia testified that she was prompted to report her sexual assault by a radio news report that the Petitioner had been charged with sexual assault on another woman. This statement was made by Kuzia in a response to a juror's inquiry as to why she waited nine months to file her complaint. (See Appendix "A")
After a careful reading of the Grand Jury proceedings, the Court finds no basis upon which such a contention can be given any weight. Numerous cases in our own State Supreme Court, as well as the United States Supreme Court, set forth the standards of prosecutorial behavior and the basis upon which an indictment can be dismissed because of prosecutorial misconduct. The allegations stated by the petitioner fail to give rise to this Court's being able to find any prosecutorial abuse in the application of the standards set forth in the following cases.
Costello v. United States, 76 S.Ct. 406 (1956)
State v. Manocchio, 497 A.2d 1, 12 (R.I. 1985)
State v. Wilshire, 509 A.2d 444 (R.I. 1986)
Bracy v. United States, 98 S.Ct. 1171 (1978)
State v. Manelli, 543 A.2d 1131 (1988)
Lerner v. Moran, No. 87-187 CA (R.I. 1988)
United States. v. Mudarris, 695 F.2d 1182 (9th Cir. 1983) cert. den. 103 S.Ct. 2097
This Court has found in the course of developing finding of facts in this decision that none of the alleged new evidence concerning the life-style of the complaining witness was known by the prosecution prior to the Grand Jury and Petit Jury proceedings, and that the State did not in any way intentionally or deliberately withhold any exculpatory evidence in the course of prosecuting this case during the Grand Jury proceedings.
The severe remedy to dismiss the indictment sought by the petitioner is without merit. There was nothing in the testimony of Kuzia which deceived the Grand Jury or impaired the ability of the Grand Jury to exercise their independent judgment.
On the basis of the Court's finding of facts on this issue, the petitioner has clearly failed to meet his burden of proof to have the indictment dismissed.
III. JURY INSTRUCTIONS
Jacques claims that the trial justice incorrectly instructed the jury that the element of force needed for the crime of first degree sexual assault is satisfied by the absence of consent. Jacques also states that the trial justice "instructed the jury with reference to weapons and forceful acts." (See, Second Amended Complaint for Post-Conviction Relief). Jacques claims the trial justice's jury instructions that referred to "forceful acts and weapons" was inflammatory. Jacques claims the trial justice incorrectly equated the force needed to convict for first degree sexual assault with an absence of consent.
In State v. Jacques, the court provided a detailed account of the sexual assault committed by Jacques. The court interpreted the sexual assault statute to mean that the type of penetration is unimportant and that every male and female has an interest in bodily integrity. The court wrote "integrity is violated regardless of the type or length of time of the penetration."Id. at 538. The court then stated:
 In his charge to the jury, the trial justice correctly set forth the factors to be considered when determining whether physical force or coercion was used by Jacques as he approached Kathy from the rear and caused her to assume a kneeling position on the chair. (emphasis added). The sexual assault was complete once Jacques's fingers penetrated into Kathy's vagina.
Id. at 539.
This Court affirms that the trial justice correctly instructed the jury.
IV. SENTENCE RECEIVED
Jacques stated that the sentence he received violated the Rhode Island and United States Constitutions. Jacques received a (twelve) 12 year prison sentence: four (4) years to serve and eight (8) years were suspended with probation. The sentence included counseling, and ordered Jacques to pay $100.00 into the Victims Indemnity Fund. Jacques contends that the record contained no evidence of violent force or penile penetration to justify the above sentence. However, in State v. Jacques, the court held:
 [w]e note that the type of penetration is unimportant under the sexual-assault statute. The fact that only digital penetration occurred does not lessen Kathy's fear and humiliation. Under the sexual-assault statute, every male and female has an interest in bodily integrity. That integrity is violated regardless of the type or length of time of the penetration. (Emphasis added) . . . The sexual assault was completed once Jacques's fingers penetrated into Kathy's vagina.
Id.
In State v. Crescenzo, 114 R.I. 242, 332 A.2d 421 (1975), the defendant received a two year sentence for embezzlement and appealed. The court stated that, only in an exceptional case, and with extreme reluctance will it interfere with the sentencing power of a trial justice. The court wrote that it will review an allegedly excessive sentence only when the record unswervingly leads to the conclusion that there is not any justification for the imposition of a sentence that is "grossly disparate from sentences generally imposed for similar offenses." Id. at 263, 332 A.2d at 433. The court, noting that the defendant inCrescenzo, was a first time offender nevertheless wrote: ". . . we cannot say as a rule of law that any prison sentence for a first offender is per se excessive." Id. at 263, 332 A.2d at 433. The court held that individuals attacking sentences as excessive have the burden of establishing, on the appellate level, the complete absence of any justification for the sentence. Id. at 265, 332 A.2d at 434. The court affirmed Crescenzo's sentence and denied the appeal.
In the case at bar, Jacques has failed to show that the sentence he received by the trial court was excessive or that any serious disparity exists between the sentence imposed upon Jacques and any other sentence by a trial justice for a similar conviction. The Supreme Court in State v. Jacques, 536 A.2d at 538, held that Jacques violated the sexual assault statute even though he did not commit penile penetration or use violent force. Jacques has failed to meet his burden to demonstrate the complete absence of any justification for the sentence. Crescenzo, 114 R.I. at 263-265, 332 A.2d at 433-434. As a result of this Court's findings on this issue, the petitioner's request to reduce the sentence is denied.
V. PROSECUTORIAL CONDUCT
A. Henry Gemma's Affidavit.
In spite of the fact that the Supreme Court discussed the probable effect of Henry Gemma's affidavit (Petitioner's Exhibit 4) upon Michelle Kuzia's credibility (see footnote State v.Jacques and quoted on page 18 of this decision) in that the Supreme Court permitted Jacques to supplement the record after oral argument with a copy of Gemma's affidavit, this Court will review the circumstances in which the omission of such information failed to reach the attention of defense counsel for Jacques prior to the trial. Henry Gemma, hereinafter referred to as "Gemma", was subpoenaed to give testimony at the evidentiary hearing as to the conversation he had with the complaining witness, Michelle Kuzia, hereinafter referred to as "Kuzia".
Gemma testified that he and a Bud Counihan in the Spring of 1983 were in charge of the Criminal Division of the Attorney General's Department.
He stated that there was no method in use at that time which required the recording of statements of complaining witnesses who either telephoned or personally appeared at the Attorney General's Office to make a complaint relative to the criminal activities of an individual.
Gemma stated he recalled Kuzia going to his office to file a complaint against Jacques. He remembered the visit to be on a Friday afternoon at approximately 4:30 p.m. sometime in the Spring of the year 1983. He recalled that Kuzia told him of an experience she had encountered some nine months ago. She said she had met a Norman Jacques somewhere in the Federal Hill section of Providence after arriving from New York City; that she was a R.I.S.D. student and after meeting Jacques landed in a tree house somewhere in Lincoln. She said Jacques showed her some pictures of models and some celebrities which included Jane Fonda, and a Marlo Thomas. She said she was sexually assaulted and did not scream because of the location of the tree house in that no one would be able to hear her. Gemma said he had spoken to a Janet Huling after the trial sometime in October 1987 and subsequently spoke to Jacques later in the year by phone. Gemma said that when he spoke to Jacques he was not aware he was being taped.
Gemma stated for the record a second time that there was no established procedure in operation at the Attorney General's Office which required the recording of conversations involving complaints which were of the nature filed by Kuzia.
Gemma further stated that he did not discuss Kuzia's complaint with either Attorney General Roberts, who was the Attorney General at the time the complaint was made, or with Attorney General Violet, who was the Attorney General at the time the case was tried before a Petit Jury.
Gemma stated that at the time Jacques' trial took place he was engaged in the Von Bulow trial and gave no attention or interest to the Jacques' trial.
Gemma stated that during the Spring of 1983 Jacques had been charged with another sexual assault complaint and prior to the bail hearing on the charge, Kuzia's complaint reached Gemma. At this point, Gemma felt that the new Kuzia's complaint would have an impact upon the bail which the Attorney General's Office would recommend on the previous charge. Gemma called Jack Cicilline, Esq. who had entered his appearance on behalf of Jacques in the pending case for the purpose of informing him of Kuzia's visit. Gemma further stated that his call to Attorney Cicilline was not intended to meet the requirements on the part of the Attorney General to comply with Rule 16 of the R.I. Superior Court Rules of Criminal Procedure.
Gemma further testified that other than Raymond Morrissette, who was an employee of the Attorney General's Office at the time Kuzia spoke to Gemma and who was invited by Gemma to be present at the time Kuzia filed her complaint, and the casual mentioning to Special Attorney General David Licht about the nature of Kuzia's complaint, Gemma did not speak to anyone else on the staff of the Attorney General nor did he record in writing in any way the nature of the complaint filed by Kuzia. He stated that prescribed procedures in effect at that time within the Department made no provision nor established any responsibility to register or record a complaint such as Kuzia had made. Gemma stated he followed the prescribed procedure at the time and referred Kuzia to the local police department of the town or city where the alleged offense had taken place. In this case, the complaint was referred to the Town of Lincoln.
Gemma stated he knew of no alleged inconsistent statement which took place at the Petit Jury trial with the statement given to him by Kuzia until he was told of it by Jacques in the phone conversation of 1987 after the trial had taken place.
Gemma was questioned as to the authenticity of his twice taped phone conversations with Jacques and stated he recalled the conversations and corroborated the content of the transcription of the taped conversations. (See Petitioner's Exhibit #5).
John F. Cicilline, Esq. was subpoenaed to give testimony on behalf of the Petitioner. Cicilline corroborated the testimony of Gemma as it related to the reason Gemma called him. He stated that Gemma had called him in the Spring of 1983, prior to a bail hearing involving Jacques, to inform him that a woman had appeared at the Attorney General's Office to inform Gemma that she had been sexually assaulted by Jacques, and that this new complaint would have an impact upon the pending bail hearing.
Detective Joseph Almond of the Lincoln Police Department was subpoenaed by the Petitioner and testified that he received a call from Gemma on June 7, 1983 for the purpose of having a complaint involving a Michelle Kuzia referred to the Lincoln Police Department. Detective Almond did not recall Gemma relating any specific aspect of the complaint but only that it involved an alleged sexual assault.
Randall White, the trial counsel for the State, was subpoenaed to testify on behalf of the Petitioner. Mr. White stated that he did not know prior to the Petit Jury trial the contents of the conversation which ensued between Gemma and Kuzia at the time Kuzia visited the Attorney General's Office for the purpose of filing the initial complaint against Jacques.
The first consideration the Court must make relative to Gemma's affidavit is whether the nondisclosure of the content of the affidavit was intentionally or deliberately withheld from the defendant.
There is absolutely not a scintilla of evidence to support any such theory. Neither Detective Almond or the State's trial counsel knew that Kuzia had told Gemma that she did not scream or cry out at the time of the assault. Having failed to establish that the State deliberately or intentionally withheld the substance of the conversation contained in Gemma's affidavit, the Petitioner has not met his burden under State v. Wyche,518 A.2d 907, 909 (R.I. 1986 on p. 910). The court in that case stated that a deliberate act of nondisclosure occurs when the prosecution makes a considered decision to suppress . . . for the purpose of obstructing or where it fails to disclose evidence whose high value to the defense could not have escaped its attention. Again, there is no evidence to establish or even suggest that this described process was implemented or as a matter of fact even contemplated.
In spite of the lack of evidence of any deliberate intent to suppress Gemma's interview with Kuzia, the Petitioner may prevail with respect to the withholding of the contents of Gemma's affidavit if he can establish a standard of materiality set forth in United States v. Bagley, 105 S.Ct. 3375 (1985). In that case, the Supreme Court set forth the standard of materiality to be applied when confronted with a failure to provide exculpatory information.
 "Evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different to undermine confidence in the outcome."
The Supreme Court made it very clear that the failure to provide possible exculpatory information does not automatically warrant a reversal. Rather, it must be determined "whether there is a reasonable probability that had the information been disclosed to the defense, the result of the trial would have been different." (Id. at 3385).
Petitioner alleges through the testimony of Defense Counsel Casparian and Appellate Counsel Hastings that had they been in possession of Gemma's statement at the time of trial, defense counsel would have used it to impeach Kuzia's testimony at the trial as it relates to her testimony that she cried and screamed at the time she was assaulted.
In State v. Jacques, 536 A.2d 535 (R.I. 1988) the Rhode Island Supreme Court noted that after appellate counsel had argued before the Court, the Petitioner was allowed to supplement the record with a copy of Gemma's affidavit. In discussing the probable effect of such testimony upon Kuzia's credibility, the court in a footnote stated:
 "After arguments were heard in this controversy the court, on the motion of Jacques's appellate counsel and over the state's objection, permitted the defense to supplement the record by the inclusion of an affidavit executed by a former assistant attorney general who had initially interviewed Kathy. This individual states as his recollection that Kathy told him that she did not scream or cry for help because it would have been futile for her to do so since no one would have been able to hear her screams. The attorney general, on the other hand, points out that Kathy's inconsistencies were demonstrated at trial through cross-examination by defense counsel who directed the jury's attention to the fact that Kathy never mentioned to the Lincoln police investigator that she had screamed during her encounter with Jacques. In explaining this omission Kathy, on cross-examination, said "I might have told him, I don't know if I told them." She also conceded that if the investigator did not write the word "scream," "I probably did not use that word." Cross-examination did, however, indicate that the term used in the police report was that she began to "whimper." It is obvious that the jury was well aware of the inconsistencies in Kathy's testimony relative to whether she screamed or cried once Jacques had pushed her onto the chair. Here the affidavit contains material which is cumulative at best but does not require the grant of a new trial. State v. Brown, 528 A.2d 1098 at 1104 (R.I. 1987)."
The conclusion reached by the Rhode Island Supreme Court accurately reflects the fact that had Kuzia's statement to Gemma "been disclosed to the defense" it would not have altered the result of the trial.
As a result of the Supreme Court's conclusion, this Court has no alternative but to accept the Supreme Court's assessment of materiality of Gemma's affidavit upon the outcome of the trial. On the basis of this finding, Petitioner's allegation of prosecutorial misconduct does not meet the standard of materiality set forth in United States v. Bagley. Consequently, this Court finds that the Petitioner has failed to meet either burden enunciated in the Wyche and Bagley cases respectively.
B. Grand Jury Tape
Jacques claims that the Attorney General's Office committed prosecutorial abuse by not providing him with a complete tape of the Grand Jury proceedings.
This Court again will concern itself with the standards for the finding of prosecutorial abuse as enunciated in the Wyche
and Bagley cases as previously articulated in the preceding subject of this decision. Again, in applying the Wyche
doctrine, this Court must determine whether the gap which was found to be present in the Grand Jury tape that was supplied to defense counsel prior to trial was caused by an intentional or deliberate act on the part of the prosecution.
The court permitted defense counsel the opportunity to promulgate interrogatories upon any member of the Attorney General's Office including two Attorneys General for the purpose of discovering any and all knowledge relative to the recording of Grand Jury testimony; its storage and safekeeping; its copying and all other procedures known to be in existence at the time Jacques was indicted, as well as the period during which his case was being tried before the Petit Jury.
In reviewing the answers to these interrogatories, there was no indication whatsoever that anyone employed by the Attorney General who had any authority to touch or listen to the Grand Jury tapes either intentionally or deliberately altered, modified, delineated, or in any way tampered with the recording of the Grand Jury proceeding which involved Jacques' case before the Grand Jury.
Jacques subpoenaed during the evidentiary hearing the State's Trial Counsel Randy White, former Assistant Attorney General Gemma and presently Associate Justice Gemma of the Superior Court, who was in charge of the Criminal Division at the time the indictment was returned, Appellate Counsel Ned Hastings, Leon A. Blaise, who was Chief of Investigations during the Violet administration (1985-86), Detective Thomas J. Almond of the Lincoln Police, Defense Counsel Richard Casparian and former Attorney General Arlene Violet for the purpose of determining if any one of them had been involved or knew of any plan or plot to alter or delete the recording of the Grand Jury proceeding.
At an evidentiary hearing dated March 23, 1990, Marie Vallier, who was in charge of the storing of Grand Jury tapes of all Grand Jury proceedings dating back to the time when Jacques was indicted, gave testimony as to the method of the storing of such tapes. She stated that she would provide Jacques with a new tape of the Grand Jury proceedings because the tape originally given to Jacques' trial counsel in 1983 was apparently lost. An order was entered by the court to provide another tape and a new tape was delivered to Defense Counsel Martin Malinou. Upon comparing the contents of the tape delivered to Malinou, with the written transcription of the original tape provided to Defense Trial Counsel Casparian in 1983, Malinou determined that there was a three and one-half minute gap in the tape originally supplied to Defense Counsel Casparian.
Upon receiving the contents of the gapped portion, both Appellate Counsel Ned Hastings and Trial Counsel Casparian prepared affidavits alleging that if they were in possession of the deleted portion, the credibility of the complaining witness, Kuzia, could have been more effectively attacked. Counsel stated in their affidavits and their testimony during the evidentiary hearing that they regarded the omitted section as potentially material to the defense of Jacques. (See omitted section of tape Appendix A attached).
Petitioner's counsel moved for the immediate granting of the relief sought in the Petition for Post-Conviction Relief upon learning of the omitted section of the Grand Jury tape. Memoranda were filed on behalf of both the Petitioner and the State, and the Court will address this issue.
Firstly, this Court would unmistakenly grant said Petition on this issue alone if the circumstances surrounding the omitted three and one-half minute gap are found to be the result of intentional or deliberate action on the part of any member of the prosecution. Id. Wyche.
The interrogatories promulgated by the Petitioner as well as the testimony elicited by the Petitioner during the evidentiary hearing failed to surface or establish any scheme or plan on the part of the prosecution to delineate in any way the original tape which was prepared from the reel established from the electronic recording of Grand Jury proceedings. The Court finds that the Jacques' Grand Jury proceeding was recorded as all Grand Jury proceedings are recorded, and in accordance with standard procedures. Jacques' proceeding was copied from the reel and was stored in the paralegal room of the Attorney General in accordance with prescribed procedures in effect at that time.
In 1983 the procedure provided that defense counsel upon request would be provided with the cassette on file in the paralegal room after a copy was made by the person in charge of the paralegal room. Defense counsel would appear at the paralegal office and sign a receipt for the original tape. The defense counsel would take the original tape and make a copy and be required to return the original tape within seven days.
There is nothing in the record or in any testimony elicited during the evidentiary hearing that this procedure was not followed during the course of preparing the tape of the Jacques' Grand Jury proceedings and the providing of a copy of the tape to defense counsel.
For some unknown reason, at some time during the copying of the original reel of the Grand Jury proceeding or in the course of copying the cassette prepared from the reel, a gap appeared on the tape utilized by Trial Counsel Casparian and Appellate Counsel Hastings.
The Court has absolutely no evidence upon which to conclude that the gap occurred as a result of any deliberate action on the part of the State. On the basis of this finding, the Court cannot grant relief as requested by Petitioner solely upon applying the doctrine enunciated in State v. Wyche, 518 A.2d 907 (1986),United States v. Keough, 391 F.2d 138 (2nd Cir. 1968). The Court, having reached the conclusion that the missing section of the tape was not as a result of any deliberate action on the part of the prosecutor, will now address the standard of materiality as it relates to evidence inadvertently withheld from the defense, namely, the missing section of the tape. United Statesv. Bagley, 473 U.S. 667. Under Bagley the standard of materiality is that only if there is a reasonable probability that had the evidence, in the instant case, the missing portion of the tape, been disclosed to the defense, the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." 473 U.S. at 682.
Edwin Hastings, Appellate Counsel, stated that he was very upset upon learning of the gap in the tape. He said that the principal area of concern was the reason Kuzia gave in delaying the reporting of the incident as she stated in the gapped portion. Hastings stated that her first report of the incident was some nine months after the alleged assault took place. He said a portion of the gap of the tape refers to how and why she called Gemma to make the initial complaint nine months after the incident took place. According to Hastings her explanation was incredible in that there is a severe disparity between her testimony to the petit jury explaining her state of mind at the time of the incident, which Hastings characterizes as casual, and her described state of mind in June 1983, nine months after the incident, when speaking to Gemma.
In the missing portion of the Grand Jury tape, Kuzia said when she was asked why she waited nine months to report the assault.
 "I heard at seven in the morning that there was a charge (against Jacques) involving a girl and I called the Attorney General at 9:00 a.m. I thought it was the thing to do that's the kind of person I am. God. I had to do this right now — it was going to help her, especially because he was pleading innocent. I listened to hear the whole thing and when she said "innocent" he was pleading "innocent" that's when I knew that I had to get in touch with someone fast."
Mr. Hastings was convinced that by bringing this portion of the Grand Jury testimony to the attention of the petit jury, the credibility of Kuzia could have been materially attacked. The fact of the matter is that trial counsel who knew of what prompted Kuzia to report the incident because it appears in the police report (see State's exhibit C) deliberately and wisely kept from the jury the reason that Kuzia came forth nine months after the alleged incident took place. Calling to the attention of the jury that Jacques had been the subject of another sexual assault would have severely prejudiced his presumption of innocence if not compel the jury to look upon him as a repeat offender.
Mr. Hastings, however, insisted upon taking the position during the testimony he gave at the evidentiary hearing that if the defense had the benefit of this portion of the missing section the outcome of the trial would have been different.
The Court can give little if no credence to Mr. Hasting's theory, particularly in view of the fact that trial counsel carefully avoided utilizing the reported reason for Kuzia coming forth nine months later. Any other trial strategy relating to the use of this information could well have supported a claim for ineffective counsel.
Mr. Casparian stated in his affidavit supplied on behalf of the Petitioner and in his testimony during the evidentiary hearing that "this missing portion of the Grand Jury tape may have produced reasonable doubt in the minds of enough jurors to avoid a conviction of Jacques."
Casparian stated that if he had the benefit of the missing portion of the Grand Jury tape he could have impeached the testimony of Kuzia at the trial relative to her familiarity with the Living Room.
During the missing portion of the Grand Jury tape, Kuzia was asked by a juror "if she had any idea where in Providence the Living Room Lounge was."
Kuzia answered "no".
The juror asked "You did not know if it was in the City or if it was in the suburbs?" — Kuzia answered "No, All I knew was the street. I was not familiar with Providence at all."
The juror then asked "So at no point did you every go near the street that it was on?"
Kuzia answered "No I was in the total wrong direction."
Casparian avers that in her testimony at trial she stated she was familiar with the Living Room Lounge.
Referring to Page 73 of the trial transcript, Mr. Casparian asked Kuzia "How did it come to pass that you became familiar with the local night spot called the Living Room?"
Kuzia replied "From a lot of people that I had known at Endicott College who were familiar with R.I.S.D. students and had visited them and had been taken to the Living Room, and also my fiance had mentioned it and told me that I could see what is going on there."
She said she had never been to Providence prior to the date of the assault. She said she had heard of it only.
As a result of analyzing the above testimony, the Court finds no discrepancy or contradiction of Kuzia's testimony at the Grand Jury as it is compared to her testimony at the trial relating to her knowledge of the actual location of the Living Room Lounge. Her testimony was consistent in that she knew of the Living Room Lounge by hearing about it but had little or no knowledge of its actual location. The missing testimony on the tape does not constitute the basis upon which the Court can find that there is a reasonable probability that had this portion of the missing tape been known prior to the trial by the defense the result of the proceeding would have been different. U.S. v. Bagley,473 U.S. 667.
Casparian further testified that he could have used the following portion of the missing tape to impeach the testimony of Kuzia in describing the physical attributes of Jacques as compared to the actual height and size of Jacques.
At the Grand Jury proceedings, a juror asked Kuzia:
JUROR: "Did he threaten to hit you if you did not comply with his wishes?"
KUZIA: "No, but like I said he was a big guy and I was afraid of him."
JUROR: "You say he was a big guy?"
KUZIA: "Well not tall big, but he's big, big, around big."
JUROR: "About your height?"
KUZIA: "Yes. I'm not sure how tall he is. I'm five four."
JUROR: **(indiscernible)** how tall he is."
big as in arm's length KUZIA: "And he is bigger/than **(indiscernible)** and he was naked and looked kind of big."
During her direct examination at trial (pg. 47) when Kuzia was asked "Were you able to determine Jacques' height?" She said "Yes I estimated him to be taller than me. I figure five seven or five eight."
The assertion that Kuzia's description of Jacques in the missing gap of the tape differed from her description of Jacques at the trial is without any basis.
Further, the jury had every opportunity to view the Petitioner's physical appearance during the trial and make their own observation concerning his physical attributes.
Casparian further stated that in the missing portion of the tape, Kuzia said Jacques was telling the truth but then in her testimony before the jury she said Jacques was trying to confuse her.
In reading the direct testimony of Kuzia at the trial regarding her discussion with Jacques at the outset of the meeting in the Federal Hill section of Providence, the Court is unable to discern any expression on the part of Kuzia to describe any effort on the part of Jacques to confuse her. It is apparent by her testimony that she had become lost in her effort to reach the Living Room Lounge and in fact was on the wrong side of the expressway when she first encountered Jacques on that afternoon. This constituted the basis for her stating that she was confused and not that Jacques had tried to confuse her.
Casparian further stated that he could have used the contents of the three and one-half minute missing section of the tape to rebut the testimony of Kuzia that Jacques had used force to influence her in getting aboard Jacques' jeep, and her being driven to Jacques' tree house in Lincoln, and in any and all aspects of the sexual encounter which occurred later that day.
During her direct and cross-examination Kuzia repeatedly admitted that she was never threatened by Jacques prior to, during, or after the sexual assault. In addition Kuzia never testified that Jacques used his physical size to overcome or overwhelm her during the sexual assault. As noted by the Supreme Court in State v. Jacques, the assault was perpetrated as a result of deceit and surprise. In fact, Kuzia was able to resist the limited extent of Jacques' penetration with his fingers and penis.
This missing portion of the tape could hardly constitute a basis for this Court to find that if the portion of the missing tape had been provided to the defense prior to the trial, the result of the proceeding would have been different. UnitedStates v. Bagley, 473 U.S. 667. Consequently, the theories propounded by both appellate counsel and trial counsel do not warrant any consideration with respect to counsel's belief that the information contained in the three and one-half minute gap would have created a reasonable probability sufficient to undermine confidence in the outcome of the trial.
The Court will now address the remainder of Jacques' allegations with respect to prosecutorial abuse in deliberately withholding evidence that could have effected the outcome of the trial.
They are as follows:
1. That the State withheld evidence from the defense regarding incidents where Kuzia appeared twice in the nude at 97 Williams Street, Providence.
2. That the State withheld evidence that Kuzia used mind altering drugs.
3. That the State withheld evidence from the defense regarding Kuzia's employment termination from the Biltmore Hotel.
4. That the State withheld the contents of the original complaint by Kuzia to Gemma.
Jacques subpoenaed Detective Almond and Detective Shea of the Lincoln Police Department, State Trial Counsel Randy White, Chief Investigator Blaise, Former Assistant Attorney General Henry Gemma, former Attorney General Arlene Violet and Defense Counsel Casparian. All of them were questioned as to any knowledge they may have had of the information listed in the aforementioned allegations.
Detective Almond, who conducted the full investigation of the case and was engaged in the designated paralegal role during the trial, was questioned extensively during the evidentiary hearing as to any knowledge he had of this information. He testified unequivocally that he knew nothing about any use of drugs by Kuzia, no knowledge of bathing in the nude at Williams Street in Providence nor did he know of any of the circumstances associated with the employment of Kuzia by the Omni Biltmore Hotel prior to the trial of Jacques. See State's Exhibit #C (full).
He testified that he did go to Mrs. Hardy's home on Williams Street where Kuzia was living at the time of the assault for the purpose of confirming that Kuzia lived there at the time of the assault. He said that he had no reason to suspect that Kuzia was not telling the truth. He said he took a statement from the husband of Kuzia, Mark Read, and said that Mark Read supported his wife's complaint and wanted to see Jacques prosecuted.
All of the affidavits and evidence in support of this alleged newly acquired evidence have been submitted and elicited by Jacques subsequent to the trial. The Court finds that any of this information acquired by Jacques was not known or even suspected by the prosecution prior to the trial. On the basis of this Court's findings, this evidence cannot be treated as potential causes for the determination of prosecutorial abuse, but the Court will analyze the potential impact it may have as newly discovered evidence. The Court will weigh the substantive value of this alleged information to determine its competency and potential impact at any new trial. State v. Lanoue,366 A.2d 1158 (R.I. 1976).
 A. Kuzia's reported appearance of nudity on roof of 97 Williams Street
Kuzia's reported appearance of nudity at 97 Williams Street was learned by defense counsel after an investigator of the Public Defender's Office contacted the owner of the property at 97 Williams Street where Kuzia was living at the time of the assault (September 1982). There is no affidavit signed by Mrs. Marjorie Hardy, owner of 97 Williams Street. All of the information supplied to Elaine Hanlon, the public defender's investigator, was made on the phone because Mr. Hardy, who allegedly saw Kuzia sunbathing on the roof, was ill and could not be interviewed. In another interview conducted by Janet Huling, an investigator retained by Jacques after the trial, Mrs. Hardy was quoted that she was told by her late husband that he observed Kuzia naked on the tin roof of their home when he went to check the window before a thunderstorm. Mrs. Huling's statement concerning her interview with Mrs. Hardy also included a comment by Mrs. Hardy that she told the police of the rooftop incident, but in the report prepared by the public defender's investigator to Casparian prior to the trial, Hardy was reported as not being certain that she related her husband's observation to the investigating officer from the Lincoln Police Department. In the statement prepared by Miss Hanlon, the public defender's investigator, she was reported to have said Kuzia ran out on the rooftop with no clothes on. In the statement to Mrs. Huling, Mrs. Hardy was reported to have said that her husband had observed her naked on the tin roof of their home when he went to check the window before a thunderstorm but no mention of her running was noted. One can only speculate that if this incident actually took place that Kuzia may have been sunbathing without clothes on and a pending thunderstorm may have caused her to leave the roof suddenly.
However, in any event neither did Mrs. Hardy or Mr. Hardy sign an affidavit to indicate that this was a personal observation based on his or her own observation.
Clearly, the information constituted hearsay in the most flagrant form and the fact that Mr. Casparian in his affidavit (see State's Exhibit E Full) stated that the information provided by Mrs. Hardy would not have assisted him at the trial considering the rules of evidence could not be more correct. Certainly such evidence was not admissible at the time of the trial, and nothing has developed to permit its use at a new trial.
Even if the observation of Mr. Hardy was permitted to be heard by the jury at a new trial, which is most unlikely, the fact that Kuzia was seen in some state of undress on the rooftop of the landlord's building is of no consequence nor contradictory to her claim that she was shy and had no intention of undressing in front of Jacques. Mrs. Hardy's statement does not indicate the height of the building and whether it can be seen from other buildings, what in fact Kuzia was wearing, whether she was standing up or lying down, whether she was alone or how often her husband watched her and the time of day it occurred. Without these additional facts, her appearance on the rooftop is not inconsistent with her testimony at trial that she was shy about taking her clothes off in front of a male. In any event neither Mrs. Hardy or Miss Huling could have testified about this alleged incident because neither one had witnessed the event. The person who had allegedly witnessed the event, Mr. Hardy, has since died.
Clearly, this alleged incident cannot constitute the basis for finding it as newly discovered evidence which could materially affect the outcome of any new trial.
 B. The use of drugs by the complaining witness.
The Petitioner avers that as a result of the work after the trial by his investigator, Janet Huling, he learned that Kuzia was a frequent user of illegal drugs prior to the trial.
Jacques relies on the statement of Mr. Read, former husband of Kuzia, who was interviewed by Ms. Huling after the trial. In that interview Ms. Huling relates that Read told her that Kuzia was dealing in drugs, that she regularly took drugs, that she had taken drugs on a beach in Beverly, Massachusetts on Easter Sunday in the year 1982, and that she was taken into custody by the Beverly Police and later released.
Mr. Read had been provided transportation and hotel fare by the court to return to Rhode Island for the purpose of giving testimony on behalf of Jacques during the evidentiary hearing. The court scheduled several sessions for his arrival and for his testimony but he never appeared. Jacques reported to the court that he had spoken to Read several times during the hearing and that Read assured him of his appearance. His statement to Detective Almond prior to the trial made no mention of any of the allegations given to Janet Huling in 1988. It is interesting to note that Read's alleged conversation with Huling took place after he became estranged from Kuzia and while a divorce proceeding was in process.
In addition, Jacques in his own statement stated he learned of Kuzia's drug addiction in his interview with a Joy Novello and Tim Lutson who were Kuzia's employers until September, 1981. Neither of these men gave testimony during the evidentiary hearing.
Review of these allegations demonstrates that none of the information regarding Kuzia's use of narcotics is material to the issues presented at trial. Furthermore, any attempt to cross-examine Kuzia concerning her use of narcotics in the months prior to the assault would have been barred by the trial justice for the same reason enunciated by the Rhode Island Supreme Court in State v. Carrera, 528 A.2d 331 (R.I. 1987).
In State v. Carrera the Rhode Island Supreme Court was faced with the present issue raised by the Petitioner — the right to cross-examine a witness on "his or her present or prior drug use."
The court stated:
 That evidence of use of drugs is admissible to show that the witness was under the influence of those drugs at the time of the events to which he or she is testifying. Such evidence of drug use bears on the question of whether the witness was accurately perceiving the events around him or her, certainly a matter of interest to the finder of fact. (Ibid. Emphasis supplied.)
 See also State v. Griffin, 567 A.2d 796 (R.I. 1989), State v. Kelly, 554 A.2d 632 (R.I. 1989).
If there was new evidence which would indicate that Kuzia took drugs on the day of the assault, or even the prior day, cross-examination on the issue could be allowed. However, since no such evidence has been presented to support this theory, the use of any history of the use of illegal drugs on the part of Kuzia could not be utilized by Jacques in any future trial.
The claim of Jacques that the illegal use of drugs prior to the trial constitute newly discovered evidence and could be helpful to Jacques in discrediting or impeaching the testimony of Kuzia is without any merit and therefore the Court finds that this information, especially the incident at Beverly, Massachusetts, does not constitute newly acquired evidence or any basis for the granting of a new trial.
 C. Kuzia's employment and its termination by the Omni Biltmore Hotel in Providence.
Testimony was elicited during the evidentiary hearing of the nature of Kuzia's employment at the Omni Biltmore Hotel and the reason she was terminated. James Lynch, Director of Personnel of the Omni Biltmore Hotel where Kuzia was employed as a desk clerk at the front desk at the Hotel, was subpoenaed to give testimony. Mr. Lynch stated that Kuzia had been warned five or six times for tardiness and for poor cash handling. One report dated March 18, 1984 indicates that during the month of February, Kuzia's cash bank was off 28% and was found to be working out of another employee's bank which is against hotel policy. In another warning notice on July 8, 1983, she was cited for carelessness and poor cash handling. (See Petitioner's Exhibit 1).
On September 20, 1992, in an employee personnel appraisal, her supervisor, Karen Ricozzi, noted that she was a good worker but needs to make a greater effort to come to work on time. On May 4, 1984, the Department of Employment Security stated that although the claimant became an unsatisfactory employee, since there is no evidence that the claimant acted in willful disregard of the employer's best interest, the termination is under other than disqualifying conditions and unemployment benefits are allowed.
When Mr. Lynch was asked if he knew of Kuzia's reputation for truth and veracity in the community, he said he "did not."
He said that he had no proof of Kuzia stealing any money and that her cash handling deficiencies were never the source or basis for instituting any complaint with law enforcement. Mr. Lynch was asked if he ever used the term pathological liar as was reported in the affidavit prepared by Huling after she interviewed Lynch. He responded that he "did not have the word pathological in his vocabulary."
The Court finds that the fact that Michelle Kuzia was unable to properly manage her cash drawer is not probative of her truthfulness or untruthfulness. (Rule 608(b)). It merely reflects that she was unable to adequately perform the duties of her position.
The Court further finds that this evidence of Kuzia's mismanagement of cash is not relevant or material for the purpose of impeaching Kuzia's credibility at any subsequent trial and therefore does not meet the test of newly discovered evidence.
 D. Gemma's taped conversation with Jacques subsequent to the trial.
The Court addressed the issue of Gemma's affidavit which had been prepared for the appeal of Jacques' conviction and reviewed by the court in its decision, State v. Jacques. However, subsequent to the Supreme Court's decision, Jacques called Gemma by phone and unbeknown to Gemma taped the conversation. This transcribed phone conversation was introduced as an exhibit for identification purposes during the evidentiary hearing. Gemma acknowledged the authenticity and accuracy of the transcription, and the Court had Gemma's statement relative to what he recalled Kuzia telling him when she appeared at the Attorney General's Office to complain about the sexual assault entered as an exhibit. (See Petitioner's exhibit 5 (full).
Defense Counsel stated that if he had the benefit of the conversation Kuzia had with Gemma, as it was related by Gemma during the taped phone conversation with Jacques, he could have used it to attack the credibility of Kuzia's testimony and could enhance his effort as defense counsel to create doubt in the minds of the jury.
Jacques avers that the comments of Gemma during the phone conversation dated October 7, 1987 embellished the contents of his affidavit and forms the basis for the purpose of establishing additional inconsistencies in the statement Kuzia gave to the police, the testimony before the Grand Jury, and the testimony she gave at the trial.
The Court will examine what Gemma recalled Kuzia said to him about the manner of her resistance and her verbal expressions which manifested her resistance and objection to Jacques' advances in the perpetration of the sexual assault. The most pertinent part of Gemma's phone conversation reads as follows:
 "Kuzia said Jacques told her after she willingly got into his Jeep that he was going to take her to his place of residence to show her his tree house. She said Jacques told her after showing her photos of other models that she could become a model and asked her to take off some of her clothing. She said one thing led to another until she was helpless. She said she was in a location where she knew it would be futile to try to resist because the location of the property was such that nobody could hear me and she said to me she never did anything, never voiced any real strong objection because she knew that it would be futile. Jacques then said to Gemma, That's very important Gemma because at that point between what you're saying and if the jurors look at the police report, where the word whimper is used, it no longer is a question of her word against my word, because when she originally went to police the word whimper was used and then at the trial she said she was screaming and crying."
In another taped phone conversation dated December 22, 1987 between Gemma and Jacques, Gemma asks Jacques (See page 1 of Petitioner's Exhibit 5).
Gemma: "Didn't she say the same thing to the Grand Jury that I recounted . . . that she didn't scream."
Jacques: "She said she may have whimpered."
Gemma: "That was the Grand Jury where she used the word whimper. Norman?"
Jacques: "Yes, I'm just trying to recollect Henry. I think she said she made . . ."
Gemma: "I wonder what she said to the police there the day after I sent her there. It was probably very consistent with what she said to me. I don't think the testimony started . . ."
Jacques: "Yeah, See what Casparian cross examines her on was the police record where she did not mention screaming or crying."
Gemma: "Oh, I see, okay."
Jacques: "Casparian during the trial said you didn't tell the police that you screamed and she said she did not, and Casparian said that the word that they have is whimpered."
Gemma: "Um hum, um hum."
Jacques: "And that's when she said well I may have told them that, yes. And he said so what you're saying is that you're telling us a different story today and she said yes."
Gemma: "I see. Good. And what she told the police and what she told me was pretty much consistent because they were very, very close in time."
Jacques: "Yeah exactly. Except she didn't even tell you whimper though, did she?"
Gemma: "No, I think I asked her specifically about the yelling, and she said no. Norman, I have to run because of a press conference."
This phone conversation revealed nothing more than the affidavit revealed. (Petitioner's Exhibit 4). The affidavit had been thoroughly reviewed in terms of how the use of it could be used to impeach Kuzia's testimony and the impact its use would have upon the jury. The only alleged additional fact is that Jacques avers that Gemma stated in his phone conversation that she didn't use the word whimper in her conversation with Gemma. When asked about this Gemma stated "no" but in that context Gemma said he only asked her about yelling and crying. He said he never elaborated about the use of the word whimper. Gemma, in the phone conversation of October 7, 1987, said to Jacques, "She said she never voiced any real strong objection because she knew it would be futile."
According to Gemma's statement to Jacques, Gemma never said she failed to even give the slightest resistance, not even a "whimper."
Gemma stated to Jacques in his taped phone conversation of December 22, 1987, "I think I asked her specifically about the crying and yelling and to that she said `no'."
During the trial (T. p. 100) Kuzia was asked if she told Gemma everything she told to the State Trial Counsel. To that question she said no. She also stated at that time that she failed to tell everything to the Lincoln Police Department.
Jacques, in assessing the value of this taped phone conversation with Gemma, is trying to develop the conclusion that when Kuzia met with Gemma she did not express any form of verbal objection, not even to the extent that she whimpered. This is not what Gemma said nor could it in any way be inferred from the total context of the original complaint filed with Gemma by Kuzia, and which was related to Jacques during the two taped conversations.
Trial counsel and appellate counsel for Jacques have repeatedly said that if they had the benefit of Gemma's affidavit and the contents of the phone conversation they would have been able to more effectively cross-examine Kuzia and raise a higher level of doubt in the minds of the jury. They aver that the fact that Gemma stated that she never screamed or cried and that she used these terms at the trial, created an inconsistency which was most significant. When reading the transcript of Kuzia's testimony when she used the word scream (T. page 38), Kuzia was asked "what she did when she felt the contact of his penis on her vagina." She said "what are you doing? I screamed it. I became stiff automatically when I felt his penis touch me. I became rigid and said what are you doing." She was further asked "During the encounter what else did you say or do?" She said, "You can't do this. What are you doing? There is no way you can do this, you have to stop right now." She stated further that she pleaded with him to stop because she was engaged and in love with her fiance and that "I didn't want anyone else to touch me." Then she was asked "As this effort was taking place, did something else happen?" Answer: "Yes when he realized I was screaming and crying and my telling him how awful this was and how he was ruining everything for me he realized I was not going to let him inside me I then felt his fingers inside me."
Again, Kuzia was asked (page 46T) "And what, if anything, did you respond when he asked you to perform oral sex with him?" She said, "I was totally disgusted and I said to him I refuse. I said there is no way. I absolutely refuse. There is no way I am going to do that to you. And he realized in my voice that I was not going to do it."
On page 50 of Transcript, Kuzia was asked "Were you frightened at all during the period you were in the studio?"
Answer: "Extremely".
Under cross-examination Kuzia was asked "What did you do when Jacques pulled your pants down?" She answered "I was shocked. I didn't stop him. I didn't physically stop him but I said `What are you doing'?".
On page 108 of Transcript, during cross-examination Kuzia was asked "What did you do when you felt the front of his body touching the rear of yours?" She responded "I said what are you doing and I screamed." She was asked: "You didn't tell the police that?" She said "I don't believe so."
Defense counsel continued to press this line of questioning.
Kuzia was asked "Isn't it fair that not once in that statement to the police did you tell the police that you screamed?" Answer: "I might have told him, I don't know if I told them. I don't know if it was recorded or something. They didn't write scream, then I probably used some other word."
Question: "You used the word whimper."
Answer: "Maybe I should look at the report."
On Page 115 of transcript — Kuzia was asked "Did you ever tell the Lincoln Police Department that you were frightened?"
Answer: "They got the impression themselves, but I don't know if I used those exact terms."
On Redirect Examination by the State, (T. page 122) Kuzia was asked "why she did not try to kick, scratch, punch or in any way physically assault Jacques."
She answers: "I tried to keep everything as controlled as possible. I did not want him to strike back. I did not want him to get violent and I tried to keep everything calm and try to use my head as much as I possibly could."
During the entire colloquy Kuzia never said she screamed for help or that she screamed for the purpose of trying to get someone's attention. Her testimony was clear that at the outset of the visit and the encounter at the tree house of Jacques she felt isolated and any effort to gain anyone's attention by screaming would be futile and perhaps precipitate a violent reaction on the part of Jacques.
There is no doubt that she didn't scream in the normal context of the use of that word which would be to gain attention or seek help. Her testimony, however, was clear in describing her feelings in having her privacy invaded by Jacques. Her expressions obviously manifested a strong disdain for what was happening and she described her verbal expressions at the trial as screaming or crying. According to her testimony she appealed to Jacques to stop because of her commitment of love to her fiance. Again, she may have used the word whimper to the police, but it is unquestionable in her testimony that she was upset and expressed it in her own emotional terms to her assailant.
Trial counsel effectively brought to the attention of the jury the inconsistencies in the use of words when she explained her actions to the police and her use of the words crying and screaming during the trial, and the jury had every opportunity to weigh the importance of the use of these words and any inconsistencies in their use.
In reviewing the contents of Gemma's taped phone conversation with Jacques, the Court cannot find anything that Gemma said that could be of any further value in any effort to more effectively impeach Kuzia's credibility.
The Petitioner has not convinced the Court that the contents of that phone conversation could have any material effect upon the outcome of any new trial. Further, the Court finds that the phone conversation does not constitute any newly discovered evidence which could possibly create a reasonable probability sufficient to undermine confidence in the outcome of the trial.
On the question of all of the alleged newly acquired evidence the Court is persuaded by the principle of law enunciated inState v. Lanoue, 366 A.2d 1158 (R.I. 1976) In that case, the Rhode Island Supreme Court held the evidence in question.
. . . "must actually be newly discovered since the trial . . . The facts must indicate diligence on the part of the defendant to try to discover this evidence for use at the original trial. The evidence must not be merely cumulative nor merely impeaching. The evidence must be material to the issue. The new evidence would probably change the verdict at a new trial." Id. at 1160-1161. Citation omitted. See also Danahey v. State, 373 A.2d 489, 491-492 (R.I. 1977), Jefferson v. State, 472 A.2d 1200 (R.I. 1984).
Deposition of Miss Darishori
During the evidentiary hearing the petitioner had requested the amount of $1,231.00 to arrange for an out of state deposition of Sara Darishori who currently resides in Atlanta, Georgia. Sara Darishori had been retained by Jacques to acquire information about the background of Kuzia subsequent to the trial. An Affidavit had been submitted by Darishori in support of the Petitioner. The Court made inquiry of the Petitioner's Counsel to explain the purpose for this deposition and requested Jacques' counsel to make an offer of proof as to what the deposition would attempt to achieve. The Court was informed by Jacques' counsel that he would acquire testimony from Sara Darishori which would corroborate that which she related to Mr. Jacques on March 7, 1988. (See Jacques' affidavit). The information would include the following:
1. That Michelle Kuzia had a drug problem.
2. That Michelle Kuzia has been arrested by the Beverly Police Department for walking down a street `naked' and under the influence of LSD on Easter Sunday, 1982.
3. That Michelle Kuzia was reported by her landlord walking naked on the rooftop of his residence on September, 1982 prior to the incident in question.
4. That Miss Kuzia had been married to Marc Read in a cemetery on Halloween Eve in October, 1982.
5. That Michelle Kuzia had been fired from her job from the Biltmore Hotel in 1984 for stealing money accompanied by no police intervention. This was an alleged occurrence which took place subsequent to the date of the alleged assault.
All of these allegations are based on information acquired through the interviews of third parties, and none of which is based on personal knowledge of Darishori. The relevancy, material and admissibility of this information has been addressed during the other sections of the decision and obviously would have no impact on any future proceedings. The request to acquire the amount of money from the State to conduct a deposition of Sara Darishori was denied by the court.
Ineffective Counsel
Jacques raised the lack of effective assistance at his trial in violation of his Sixth Amendment Constitutional right in the petition for Post-Conviction Relief. State v. Gibbons,418 A.2d 830 (1980). Jacques alleges in an affidavit of June 30, 1991 that defense counsel Richard Casparian, hereinafter referred to as "Casparian", was ineffective for the following reasons.
1) That Casparian believing that Kuzia was not going to show up to testify failed to prepare for trial and spent approximately two hours preparing for trial on his case.
2) Mr. Casparian expressed disappointment that Jacques refused a plea bargain offer in which Jacques was offered a 5 year deferred sentence.
3) That Casparian was overburdened with too many cases which prevented him from properly preparing for his case.
4) That Casparian failed to engage into an investigation of the background of Kuzia to find out what she did, where she worked and where she went to school.
5) Casparian failed to listen to a Grand Jury tape, and had he listened to the tape, he would have discovered a three and one-half minute gap in the tape.
6) Had Casparian engaged in a background check he would have found that Kuzia had been fired from two jobs for stealing on her job; engaged in promiscuous sex . . . even while married; had been involved in the use of illegal drugs; had been hospitalized on two occasions for drug use; that she was suffering from a Borderline Character Behavior if a psychiatric examination had been requested by defense counsel.
7) That defense counsel failed to object to jury instructions.
8) That defense counsel failed to utilize 25 character witnesses who were prepared to testify on behalf of Jacques.
9) That defense counsel never discussed the strategy which involved letting the case go to the jury after the State rested without Jacques taking the stand.
During the evidentiary hearing Jacques stated the following in support of the allegations.
1) If I knew what Kuzia had said to Gemma in filing the initial complaint in June 1983. I would have been less pressured to take the stand in my own defense.
2) If I knew of the contents of the three and one-half minute gap in the Grand Jury tape, I would not have taken the stand.
3) If I knew at the time of the trial the nature of Kuzia's background, I would not have taken the stand.
4) That the total amount of time spent with Casparian in preparation of the trial was two hours.
5) That trial counsel did not advise me to remain silent, as a matter of fact, he encouraged me to take the stand.
6) That Casparian failed to investigate the background of Kuzia and to request a psychological examination of Kuzia.
7) That Casparian failed to investigate the use of drugs by Kuzia and her reputation for truth and veracity within the community.
8) That when I refused to accept the offer made by the State for a deferred sentence, Casparian said "So you want to roll the dice."
9) After supplying a list of 25 character witnesses, Casparian only called one.
During the cross-examination of Jacques, he stated that:
1) He had attended Antioch Law School in Washington D.C. for two years; he attended Harvard as a Special Student; attended Portia Law School and attended Emerson College for three years.
He stated that he did not engage in any effort before the trial to determine the nature of Kuzia's background nor did he have any contact with Gemma. He said he saw Gemma's name in the Lincoln Police report but never thought about contacting him nor did he tell Casparian that Gemma's referral of the case to the Lincoln Police Department should be the subject of inquiry. He said that he had been asked by Casparian to submit a list of his witnesses several times before the trial, but he never thought the case would go to trial because of Casparian's comment that Kuzia would not be available. He further stated I made the mistake of not worrying. He said he called Casparian, but Casparian never returned his calls. Again, he said Casparian never told him to rest on his presumption of innocence. He said Casparian never spoke to Mrs. Hardy, landlord of Kuzia, prior to the trial.
Casparian was called to the stand to corroborate the sworn statement he made in a signed affidavit executed on July 15, 1988 in response to Jacques' allegations of ineffective counsel. (See State's Exhibit E).
He denies categorically all of the allegations of Jacques. He stated that although he had a heavy caseload, he had adequate staff to engage in the necessary investigation to prepare adequately for each case. He states that he did have the landlord of Kuzia interviewed and that he received the contents of the report of his department's investigator, Elaine Hanlon. (See State's Exhibit D).
Casparian further stated that in accordance with the rules of evidence, the contents of Mrs. Hardy's statement could not be used. Mrs. Hardy's statement contained hearsay and irrelevant material relative to Mrs. Hardy's husband telling Mrs. Hardy that he observed Kuzia sunbathing on the roof of Mrs. Hardy's apartment building without clothes.
Casparian denied the allegation of his time being unavailable because of a heavy case load, and he testified that he spent the necessary time to prepare for the case. The Petitioner offers no proof to support these allegations to the contrary, and the transcript of the proceedings clearly manifests that defense counsel was adequately prepared and had a complete and thorough knowledge of the allegations and the law of the case. His cross-examination of the complainant was thorough and most skillful.
Casparian stated that he had an obligation to engage in meaningful pretrial sentence negotiations and if he did manifest some disappointment over the fact that Jacques refused a deferred sentence, the outcome of the trial clearly indicated that the decision to refuse the offer could well have been a mistake of judgment on the part of Jacques.
Casparian stated that he had no basis to engage in any additional investigation concerning the background of Kuzia, the complaining witness. Casparian was not privy before the trial to any information which would prompt him to assign his department investigators to engage in a background check of Kuzia. Her prior contact with the Beverly Police Department, and the nature of her employment at the Biltmore Hotel, and Judge Gemma's interview with Kuzia came to the attention of Jacques and Casparian after the trial. This subsequently acquired information has been addressed by the Court in prior sections of this decision.
Casparian testified he listened to the Grand Jury tapes and utilized it in every way possible to impeach Kuzia's testimony at trial. The transcript clearly supports this statement. There was no way he could have known of the three and one-half minute gap in the tape. This gap became known during the Post-Conviction Relief proceedings, and this Court has weighed carefully the potential use of the testimony which appeared in the gap.
Casparian stated that he did not object to the trial justice's jury instructions because he thought it conformed to the law, and the Supreme Court in reviewing the trial judge's instructions agreed with the legal aspects of the trial judge's instructions.
Defense counsel stated unequivocally that he advised Jacques not to testify after the State rested, but Jacques insisted upon relating his version of the circumstances of the incident. Casparian stated he had full confidence in his ability to persuade the jury that Jacques was not guilty. However, in Jacques insisting upon taking the stand, Jacques diverted the jury's attention to himself.
Casparian stated he first met Jacques in August, 1983 and found Jacques very difficult to talk to and to be reached. He said that when he finally got a list of character witnesses from Jacques, the list was cumulative and any attempt to use the array of witnesses would most likely not have been permitted by the Judge. Casparian did in fact use one witness, a Mrs. Janet Snow, a professor and a wife of a well-known and respected attorney who did a most commendable job in describing the reputation of Jacques for truth and veracity in the community.
Although this Court is most impressed by the testimony of Mrs. Elizabeth Snow, a professional physical therapist, it is most concerned as to the allegations of Jacques that he wanted defense counsel to use additional character witnesses whose names were supplied to Casparian prior to the trial. In order to establish the reasons and basis for the use of only one character witness, this Court ordered a supplemental evidentiary hearing to permit counsel to elicit additional testimony on this issue.
Further, the Court must be certain that Casparian had supplied the State a list of defense witnesses in compliance with Rule 16 of the Superior Court Rules of Criminal Procedure. Failure on his part to do this would constitute running the risk of not having been able to use any individuals named in the list.
Upon checking the record, a list was clearly supplied to the Attorney General prior to the trial. (See State's Exhibit 7). Consequently, Casparian was clearly in a position to utilize any of the individuals named in the list of character witnesses at the trial if he chose to do so.
Secondly, the Court must determine whether any of Jacques' constitutional rights were waived involuntarily as a result of the decision of Casparian to use only one of the witnesses of the twenty-five names submitted in the discovery process.
Two Rhode Island cases, State v. Mendes, 99 R.I. 606 andState v. Duggan, 414 A.2d 788 establish the basis upon which the proper waiving of a constitutional right of the defendant can be acknowledged.
In the Mendes case, our Rhode Island Supreme Court held that there was no valid waiver of the right to counsel and the right to remain silent after trial counsel permitted an incriminating statement to be introduced. This was permitted in spite of the fact that the defendant was not informed of his right to remain silent or his right to counsel before the statement was recorded by the police during the initial investigation of the case. The Court held that the failure on the part of trial counsel to object to the use of the statement was not binding upon the defendant in the absence of the defendant's participation in such a trial strategy. Our Supreme Court held that there was nothing in the record that indicated that the defendant participated in the decision not to object to the introduction of a statement during the trial, which statement was obtained in violation of the defendant's constitutional right during the investigation of the case. The Court held that this constituted a non-waiver of his constitutional right.
In State v. Duggan, the court found that defendant's participation in the intentional failure to raise the issue of a defective search warrant at trial established no basis for relief during the post-conviction process.
The finding on the part of the trial judge who presided over the post-conviction proceeding that the defendant knew of orshared in the trial strategy not to object to the introduction of a damaging piece of evidence which was acquired in the course of executing a facially defective arrest warrant was crucial. In other words, the trial judge found that trial counsel deliberately bypassed the warrant issue at trial as a matter of trial strategy and that the defendant's participation and/orconcurrence in the decision to waive his constitutional right to suppress illegally obtained evidence was the determining factor in determining that the defendant's constitutional right was waived voluntarily. This Court must determine whether the action taken by Casparian not to utilize the entire character witness list gives rise to the involuntary waiver of any constitutional right of Jacques.
The testimony elicited at the specially called evidentiary hearing to address this issue clearly indicates that:
1) The list of witnesses was prepared by the defendant and was timely reported to the Court in compliance with Discovery Rule 16 of the Superior Court Rules of Criminal Procedures.
2) That defense counsel interviewed at least one witness, a Mrs. Snow, who was well known by Jacques prior to the trial.
3) That defense counsel discussed the use of Mrs. Snow with Jacques and, according to defense counsel's testimony, he discussed the use of the list of witnesses with Jacques prior to trial. Casparian stated he was never told by Jacques as to how many witnesses Jacques wanted to call to testify, nor did Casparian recall Jacques disagreeing with him as to how Casparian would use the list. Casparian said he would not have made the decision alone to call only Mrs. Snow. Casparian testified that he more likely than not told Jacques one good witness would be sufficient and Jacques appeared pleased with the result and never suggested the use of more than one witness. Casparian stated that character witnesses are not necessarily used in criminal cases. He stated that in the Jacques case the chief issue was whether the jury believed his account of the incident or believed the complaining witness. Further, Casparian stated that bringing an array of character witnesses to the stand could be counterproductive. Further, Casparian said if Jacques insisted on the use of several witnesses, he would have spoken to the prosecutor and the Judge about a continuance to arrange for their appearances.
Casparian stated he did not talk to the trial judge about how many witnesses would be used nor did Casparian recall ever telling Jacques that the Judge would not allow the use of more than one character witness. Jacques testified that Casparian told him that he had spoken to the trial judge, and the Judge told Casparian that no more than one witness would be permitted. Mr. Jacques testified that he wanted Casparian to call the then Attorney General Arlene Violet as a character witness, who Jacques stated he knew well and was certain she could be influential in convincing the jury that Jacques' testimony as to the nature of the incident was reliable and worthy of belief by the jury. The likelihood of then Attorney General Violet becoming a character witness at a criminal trial, which was the subject of prosecution by her own department, appears non-existent, particularly in view of her own statement earlier in the evidentiary hearing that she had made every effort to avoid becoming even familiar with the Jacques' case to avoid any appearance of partiality due to her prior contacts with Jacques before she became Attorney General. Again, Casparian stated he was convinced that Jacques was satisfied with the result of Mrs. Snow's testimony and was persuaded to rest the defendant's case. Mr. Casparian stated further that he considered the likelihood of precipitating the use of counterweight witnesses by the State if more witnesses were used by Jacques, particularly in light of the fact that a second charge for sexual assault was pending against Jacques at the time the instant case was called for trial.
Mr. Casparian stated that during his entire career as defense counsel he could not recall ever calling more than two character witnesses. The list of witnesses supplied by Jacques included many former girlfriends, and Casparian stated that to use them would constitute an overkill and be counterproductive.
Jacques in his testimony said he wanted to call all the witnesses but was told by Casparian that Judge Kiely, trial judge, would allow only one. As was previously stated, this was emphatically denied by Casparian in his testimony. Jacques stated that one principle reason he wanted to call all of the witnesses, including former sweethearts, was for the purpose of having them testify of "my lovemaking technique" in an attempt to establish his reputation for non-violent lovemaking. Jacques further stated he never brought up the issue of being refused the right to call all of the witnesses with appellate counsel, and this issue was never argued in the appellate proceeding. He further stated that he did not call or notify his list of character witnesses to inform them of the date of his trial.
The Petitioner, Jacques, as a well educated and articulate person, most certainly would have been sought out by defense counsel on the course of the conduct of the trial, particularly as it relates to the manner in which character witnesses should be employed. Casparian articulated well the reasons for his decision to utilize only Mrs. Snow. It is inconceivable that he discussed this decision with the trial justice and was told that he could use only one witness. It is conceivable that he told Jacques that the use of the entire list would not be looked upon favorably by the trial justice and be counterproductive with the jury. As a result of the Court's analysis of the testimony on this issue, the Court is convinced that the standard for effective counsel enunciated in Strickland v. Washington, 104 S.Ct. 2052 (1984) should be applied in the instant case. In that case, the court held that:
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining defense counsel's defense, after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.
 [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."
In order for a defendant to meet his burden of proof under this analysis, it must be established that "counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment" and "that the deficient performance prejudiced the defense" so "as to deprive the defendant of a fair trial, a trial whose result is reliable."Id. at 2064.
Strickland had challenged his counsel's decision to not call character witnesses at his sentencing hearing, at which he was sentenced to death. Counsel had decided to not call such witnesses in order to ensure "that contrary character and psychological evidence and [his] criminal history" would be excluded. Id. at 2071. The Court held that this strategic decision "was well within the range of professionally reasonable judgments . . ." Id. at 2070. As a result, the court found thatStrickland had failed to show either deficient performance by his counsel or sufficient prejudice.
In State v. Welch, 330 A.2d 400 (R.I. 1975), the defendant and his counsel elected to not call witnesses at a probation violation hearing despite the fact that such witnesses were available to testify.
In that case, the Rhode Island Supreme Court held that "a tactical decision which later proves to be a less feasible choice than the one made will not in and of itself be a basis for a claim of deprivation of the right to effective counsel." Id. at 402. The decision to not call witnesses was such a "tactical decision" the defendant would have to live with. Id. at 401.
In support of its decision that Welch's attorney had not been ineffective, the Court also noted:
 "Trial counsel must make many decisions of an almost infinite variety in the court of a criminal trial: whether to advise a plea to a lesser offense; whether to object; whether to offer a witness of possibly doubtful credibility or with a criminal record; whether to risk crystallizing the view of the judge at that point by a motion for a direct verdict before the defense testimony is in; whether to advise the defendant to take the stand and subject himself to cross-examination; how to argue the case to the jury; whether to advise the defendant not to go to trial at all but rather rely upon the mercy of the court. All these and more are practical questions and very real questions. Bad judgment, or even good but erroneous judgment, may result in adverse effects. These are simple facts of trial, they are not justiciable issues." Id.
at 401, quoting Mitchell v. U.S., 259 F.2d 787
(D.C. Cir. 1958)
Based upon the decisions in Strickland and Welch, the Petitioner has clearly failed to establish that Mr. Casparian was ineffective based upon the decision to call only one character witness at trial. The decision to only call Mrs. Snow was a wise tactical decision based upon Mr. Casparian's extensive experience as a trial attorney defending capital offenses. Furthermore, this decision was made with the Petitioner's tacit approval. According to the Petitioner, other character witnesses were present to testify in his behalf. Had the Petitioner sought to present additional character witnesses, it is obvious that counsel, after having advised his client of the inherent risks of such action, would have been persuaded to present such witnesses. The Court finds that the tactical decision to use the one character witness was well understood and concurred with by the Petitioner.
The holding in the case State v. Mendes, 210 A.2d 50 (R.I. 1965), does not detract from the finding that counsel in the instant case was effective in the decision to call only one character witness. In Mendes, defense counsel agreed to the admissibility of his client's incriminating statement despite the fact that Mendes had not been apprised of his rights by the police before giving the statement. Upon review, the Court found that error had been committed since Mendes had not agreed to this waiver of his constitutional rights nor had he "participated in his counsel's decision in this matter." Id. at 614.
The decision to call only one character witness does not rise to the level of failing to object to the admissibility of a constitutionally infirmed statement. Furthermore, where the record in Mendes reveals that the defendant did not agree to the admissibility of the statement, the record in the present case demonstrates that the Petitioner was aware and manifested a concurrence with the decision by Mr. Casparian to rest after calling only one character witness.
The Supreme Court decision in State v. Duggan, 414 A.2d 788
(R.I. 1980), supports this Court's finding that trial counsel was effective in his decision to call only Mrs. Snow as a character witness in that this was trial strategy that the defendant Jacques ostensibly concurred with. It is inconceivable that any attorney of the caliber and experience of Mr. Casparian would not have called additional character witnesses if he felt it would benefit the Petitioner. Id. at 792. His decision to call only one such witness was based upon his training and experience, and his understanding of Jacques concurrence.
On another issue arising out of Jacques' complaint of ineffective counsel, he alleges that the complaining witness, Kuzia, was engaged in a pattern of sexual promiscuity and aberrant behavior and that she had all the signs of suffering from Borderline Character Disorder. He avers that if there had been an examination conducted by trial counsel into her character, this disorder could have been discovered and used in the trial.
To support the averment, Jacques supplied an affidavit after the trial of a neurologist and psychiatrist, Dr. Maureen Polsly. In her affidavit dated May 10, 1988, she stated that she "became acquainted with Jacques' version of what happened between him and Kuzia and a few background facts." The facts that she used as a basis for her opinion were predicated on the assumption that the hearsay statement of Janet Huling were all true and constituted admissible evidence for the purpose of establishing facts upon which a professional opinion could be based. She stated in her affidavit that in order to make a definite diagnosis, "I would have to get to know the patient firsthand and know the details of her past history." She went on to say that the affidavits have largely confirmed my previous strong suspicions.
Finally, as the Court has previously stated, none of the hearsay statements contained in the affidavit of Jacques' investigator, Janet Huling, were offered prior to the trial and therefore Casparian had no basis whatsoever to even suspect any pattern of life-style which would suggest the retention of a psychiatrist for the purpose of having Kuzia examined. Unfortunately, Kuzia met an untimely death in an auto accident after the trial, and there is no possible way that Dr. Polsly or any other physician could examine her and acquire the necessary history to determine a positive diagnosis as to the existence of any Borderline Character Disorder.
Clearly, the affidavit of Dr. Polsly does not establish any basis upon which the Court can determine that trial counsel failed to meet the standard of effective counsel as enunciated in the Strickland case. In addition, the affidavit of Polsly does not constitute any newly discovered evidence which could possibly create a reasonable probability sufficient to undermine confidence in the outcome of the trial.
Based upon the Court's finding of facts and the application of the pertinent cited case law relative to the allegations of ineffective counsel, this Court has no alternative but to conclude that the petitioner has failed to meet his burden to prove that trial counsel was in any way deficient to the extent that the petitioner suffered any substantial prejudice.
The petitioner argues strongly that the use of words describing Kuzia's state of mind given to Gemma by Kuzia at the time she made her initial complaint should have been supplied to defense counsel under Rule 16 of the R.I. Super. R. Crim P.
Rule 16 provides that the State
 "shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State."
The relevant subsection (7) reads as follows:
 "as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded testimony before a grand jury of such persons and all written or recorded verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial;"
The testimony of Gemma clearly indicates that the complaint of Kuzia was not recorded or written but that it was the practice of the Attorney General to refer such a complaint to the local Police Department where the alleged offense took place.
Petitioner argues that in accordance with the applicability of Rule 16, the Attorney General in the exercise of due diligence, should have been able to retrieve or in some way acquire the verbatim conversation that Kuzia had with Gemma.
Subsection (7) of Rule 16 provides an obligation on the part of the Attorney General to provide all written or recordedverbatim statements signed or unsigned of any person who the State intends to call.
There was no recording of any conversation or written statement of Kuzia in existence at the time that compliance of Rule 16 was made by the State. Therefore, the State could not in the exercise of any degree of due diligence provide Jacques with the conversation that Kuzia had with Gemma. As the Court has found, there was no intentional or deliberate intent on the part of the State to withhold any information it was compelled to reveal under Rule 16, nor was there any information which the State could have provided Jacques in the exercise of due care.
The petitioner further argued that if he knew of the contents of the three and one-half minute gap in the Grand Jury tape and Gemma's conversation with Kuzia, he would have been more inclined to rely upon his presumption of innocence and to not testify in his own defense. He predicated this belief on the basis that the credibility of Kuzia could have been more effectively questioned by the use of her inconsistent statements contained in the gap and the conversation with Gemma and thereby diminish the need for his own testimony.
Both the Supreme Court in State v. Jacques, Id. and this Court have assessed the impact of this information upon the jury and have concluded that it would have had no effect upon the outcome of the trial.
The Court's finding of facts does not support in any way this petitioner's contention. Further, the petitioner in earlier testimony, stated the principle reason he testified was because of the fact that his defense counsel failed to inform him of his right to rest on his presumption of innocence. A statement which defense counsel has emphatically denied and which the Court has found as a fact.
Conclusion
The Petitioner Jacques has raised many cogent and salient issues in the allegations enumerated in his Petition for Post-Conviction Relief.
Jacques has the burden of proving by a preponderance of the evidence any one or more of these allegations. The Petitioner relies heavily upon the life-style of the complaining witness, Kuzia, which was unknown to Jacques and the State prior to the trial. Unfortunately, as the Court has found this newly found evidence, even if known before the trial, could not have been used at the initial trial because of its lack of competency and the statutory and case law which precludes its use.
In addition, the constitutional questions raised as they relate to the Grand Jury proceedings and prosecutorial abuse are without merit. Great time and attention was given to the statement of the former Assistant Attorney General and present Superior Court Judge Henry Gemma, and again, the extensive analysis engaged by this Court of this evidence does not warrant any basis for the granting of any Post-Conviction Relief. The Court made a careful analysis of the reason for the existence of the three and one-half minute gap in the Grand Jury tape and its potential value of its impact upon the outcome of any new trial and found no basis to grant a new trial on this issue.
The allegations with respect to ineffective counsel was the subject of an extensive and lengthy evidentiary hearing, and after an exhaustive study of the testimony and the application of the pertinent law to the Court's finding of fact on this issue, the Petitioner failed to meet its burden to prove any of the allegations of ineffective counsel.
Based upon the Court's categorical analysis of each issue raised by the Petitioner, the Court has no alternative but to deny and dismiss the Petitioner's application for Post-Conviction Relief.
The State may enter judgment consistent with the Court's decision.
 APPENDIX "A"
 A transcription of the 3 minute 50 second segment follows:
 3 MINUTE 50 SECOND TRANSCRIPTION
 Page 1 of 3
KUZIA: And so I had to you know ** (indiscernible)** He knew
 that I was upset. But I could tell he was going to be
 even more upset at that time. So I tried to keep calm.
ATTY GEN: But were you still upset about what happened when you
 told him?
KUZIA: Very. I'm still upset you know from that right now and
 I was very upset then.
ATTY GEN: OK. OK. Does anybody have any questions?
KUZIA: Yes. (Recognizes a juror)
JUROR: **(indiscernible)** Where are you originally from?
KUZIA: I'm from New York and I moved here to go to school,
 **(indiscernible)** At that point the first week I just
 moved here. I came here on Saturday, my parents left,
 and that was the following Monday.
JUROR: **(indiscernible)**
KUZIA: They went to New York.
JUROR: What I wanted to ask you: You say you had a map of the
 City of Providence and apparently somebody had
 recommended the Living Room.
KUZIA: Yes, I read in the paper **(indiscernible)** I was
 to Rhode Island.
 new/ **(indiscernible)** Providence paper
 **(indiscernible)** found it in the paper
 **(indiscernible)** good idea to go in the afternoon
 and find the place first. Then it would be no problem
 to find it that evening when I went.
JUROR: So, in other words, you had no idea where in Providence
 this was?
KUZIA: No
JUROR: No idea if in the city or in the suburbs.
KUZIA: No, all I knew was the street. I was not familiar with
 Providence at all.
JUROR: Where did he point to where the Living Room was?
KUZIA: OK. Uhh. I got mixed up around the circle. I did not
 know I should go that way. Promenade was a long street
 so I thought it was either by Atwells or parallel to
 Atwells. I got that impression as the map will show you
 that **(indiscernible)**
JUROR: Were you past the Holiday Inn?
 3 MINUTE 50 SECOND TRANSCRIPTION
 Page 2 of 3
KUZIA: Yes, I was pass the Holiday Inn. I was off Atwells on
 another street off Atwells.
JUROR: So you were walking away from Providence?
KUZIA: Right, I thought that Atwells and Promenade were going
 to connect by streets. So I went by that location.
 That's when he pulled up. I think it was by some kind
 of a theatre. A desolate theatre off Atwells somewhere.
 And it was like a theater. That's all I can remember.
 And he pulled up and he pointed, if I get my bearings
 straight, in the right direction.
JUROR: He pointed to the city?
KUZIA: No, he pointed to the CIC building.
JUROR: Do you know where the Living Room is now?
KUZIA: Yes.
JUROR: Was it moved then?
KUZIA: Yes, it had been moved. I think just recently at that
 time.
JUROR: So, he was telling the truth.
KUZIA: Yes he was.
JUROR: Did he threaten to hit you if you did not comply with
 his wishes?
KUZIA: No, but like I said he was a big guy and I was afraid
 of him.
JUROR: You say he was a big guy?
KUZIA: Well not tall big, but he's big big, around big.
JUROR: About your height?
KUZIA: Yes. I'm not sure how tall he is, I'm five four.
JUROR: **(indiscernible)** how tall he is.
 big as in arm's length
KUZIA: And he is bigger/than **(indiscernible)** and he was
 naked and looked kind of big.
JUROR: How come you waited all this time **(indiscernible)**
ATTY GEN: Go ahead.
JUROR: When you heard on the radio that **(indiscernible)**
 was that about the car that was stolen?
KUZIA: No, that was the first charge he had which was the
 girl. *** on that day *** I heard it at seven in the
 morning and I called the attorney general at nine. I
 had to go to work and I got a chance to call then.
 3 MINUTE 50 SECOND TRANSCRIPTION
 Page 3 of 3
JUROR: What brought you to approach the police?
KUZIA: Me. Not my husband, not anyone, Actually, my husband
 was shocked to hear about it, but me. I thought it was
 the thing to do, that's the kind of person I am. God, I
 had to do this right now * * * it was going to help her
 * * * especially because he's pleading innocent. I
 listened to hear the whole thing and when she said
 "innocent", he was pleading "innocent" that's when I
 knew that I had to get in touch with someone fast.
ATT GEN: OK
 END OF GAP